Danny RIDLING *v.* STATE of Arkansas

CR 01-934                                    72 S.W.3d 466

Supreme Court of Arkansas
Opinion delivered April 18, 2002

*John Wesley Hall, Jr.*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Danny J. Ridling was charged under Ark. Code Ann. § 5-14-103(a) (Repl. 1997) with the rape of a girl (Kimberly) who was less than fourteen years old. He was originally charged with carnal abuse, but the State upgraded the offense when the girl informed the prose-

cutor that the incidents of sexual intercourse commenced earlier than she had originally revealed. It is undisputed that before Ridling was charged, Kimberly was pregnant and had given birth on March 19, 1997, to a child that Ridling later acknowledged to be his. The child was born approximately nine months after Kimberly's fourteenth birthday. Kimberly stopped seeing Ridling just after her fourteenth birthday. At a jury trial, Ridling was convicted of the rape charge and sentenced to 420 months in prison.

Ridling raises three points for reversal, the first of which is his argument that the trial court erred in excluding allegedly false statements, made by Kimberly, under the rape-shield statute, Ark. Code Ann. § 16-42-101 (Repl. 1999). Subsection (b) of 16-42-101 provides in pertinent part as follows:

> *In any criminal prosecution under § 5-14-103* through § 5-14-110, or for criminal attempt to commit, criminal solicitation to commit, or criminal conspiracy to commit an offense defined in any of those sections, opinion evidence, reputation evidence, or *evidence of specific instances of the victim's prior sexual conduct with the defendant or any other person*, evidence of a victim's prior allegations of sexual conduct with the defendant or any other person which allegations the victim asserts to be true, or evidence offered by the defendant concerning prior allegations of sexual conduct by the victim with the defendant or any other person if the victim denies making the allegations *is not admissible by the defendant, either through direct examination of any defense witness or through cross-examination of the victim or other prosecution witness, to attack the credibility of the victim, to prove consent or any other defense, or for any other purpose.* (Emphasis added.)

Notwithstanding the prohibition in subsection (b) above, subsection (c) of § 16-42-101 provides that evidence directly pertaining to the act upon which the prosecution is based or evidence of the victim's sexual conduct with the defendant or any other person may be admitted at the trial if the relevancy of the evidence is determined in the following manner:

> (1) A written motion shall be filed by the defendant with the court at any time prior to the time the defense rests stating that the defendant has an offer of relevant evidence prohibited by

subsection (b) of this section and the purpose for which the evidence is believed relevant;

(2)(A) A hearing on the motion shall be held *in camera* no later than three (3) days before the trial is scheduled to begin, or at such later time as the court may for good cause permit.

(B) A written record shall be made of the *in camera* hearing and shall be furnished to the Arkansas Supreme Court on appeal.

(C) *If, following the hearing, the court determines that the offered proof is relevant to a fact in issue, and that its probative value outweighs its inflammatory or prejudicial nature, the court shall make a written order stating what evidence, if any, may be introduced by the defendant and the nature of the questions to be permitted in accordance with the applicable rules of evidence*[.] (Emphasis added.)

* * *

In the instant case, Ridling requested an *in camera* hearing where he proffered nine statements attributed to Kimberly. The trial judge found three of these statements to be relevant, and at trial, he allowed Ridling to cross examine Kimberly regarding them.[1] These statements, or "areas of inquiry" as characterized by Ridling, were:

(1) She told the police that she was fourteen years old when she started having sex with the defendant.

(2) She told [deputy prosecuting attorney] John Hout that she was twelve years old when she first had sex with the defendant.

(3) She testified in Sixth Division Chancery that she was eleven years old when she first had sex with the defendant.

The six remaining statements attributed to Kimberly that the trial judge ruled inadmissible are the following:

(4) She told Michael Loftin, Sr., she was eighteen years old.

(5) She told Billy Owens (Ridling's roommate) that she was eighteen years old.

(6) She told Daniel Ridling (Ridling's son) that she was playing college basketball.

(7) She told Ridling that she was eighteen years old.

---

[1] The prosecuting attorney conceded these three statements of Kimberly were admissible.

(8) She told Chris Ridling (Ridling's other son) that she was eighteen years old and getting ready to play college basketball.

(9) She told the hospital that the father of her child was Michael Lofton, Jr.

At the pretrial hearing, the prosecuting attorney objected to statements 4 through 8 because what age Ridling believed Kimberly to be was completely irrelevant to the offense. The prosecutor cited Ark. Code Ann. § 5-14-102(b) (Repl. 1997), which specifically provides that "[w]hen the criminality of conduct depends on a child being below the age of fourteen (14) years, it is no defense that the actor did not know the age of the child, or reasonably believed the child to be fourteen (14) years of age or older." Defense counsel conceded that Ridling's belief as to Kimberly's age was not relevant to the rape charge, but argued the six excluded statements went "towards this young woman's credibility and her propensity for (lack of) truthfulness." In support of these arguments, counsel, in part, relies on the case of *West v. State*, 290 Ark. 329, 719 S.W.2d 684 (1986), *reh'g denied* 290 Ark. 340-A, 722 S.W.2d 284 (1987). We believe the trial court ruled correctly in excluding the six statements proffered by Ridling.

On appeal, Ridling first relies on the case of *Fowler v. State*, 339 Ark. 207, 5 S.W.3d 10 (1999), where this court, citing Ark. R. Evid. 402, stated the general rule that all relevant evidence is admissible. The court further set out the definition of relevant evidence as "any evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Ark. R. Evid. 401. The court also stated a witness's credibility is always an issue, subject to attack by any party, and the scope of cross-examination extends to matters of credibility. Ark. R. Evid. 611. The *Fowler* court cited *Davis v. Alaska*, 415 U.S. 308 (1974), for the following proposition:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested . . . . The cross-examiner is not only permitted to delve into the [witness's] story to test the [witness's] perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

■ In *Bowden v. State*, 301 Ark. 303, 783 S.W.2d 842 (1990), this court relied on *Delaware v. Fensterer*, 474 U.S. 15 (1985), in stating the following:

> The sixth amendment to the United States Constitution and Art. 2, § 10 of the Arkansas Constitution guarantee the right of an accused in a criminal prosecution to be confronted with the witnesses against him. The right of confrontation provides two types of protection for a criminal defendant: the right physically to face those who testify against him and the opportunity to conduct effective cross-examination.

■ However, the *Bowden* court went on to say that the right to cross-examine the prosecution's witnesses is not unlimited, and that trial judges have wide latitude insofar as the Confrontation Clause is concerned "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." The court added that the Confrontation Clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Id.*

■ Keeping the above-established principles in mind, we first note that we agree with the trial court, and the State on appeal, that the core issue to be decided in this part of Ridling's argument is whether Ridling had sexual intercourse with Kimberly when she was under fourteen years of age. It is also clear that it was no defense that Ridling did not know Kimberly's age, or that he reasonably believed Kimberly to be fourteen years of age or older. *See* § 5-14-102(b). Turning to the six statements Ridling asked to pursue on cross-examination of Kimberly, statements 4 through 8 had no relevance as to whether Ridling had sex with Kimberly when she was under fourteen years of age. Certainly, even if he had been apprised that she told the other men that she was over the age of fourteen, such knowledge would be of no benefit to his defense in light of § 5-14-102(b). We now turn to the State's case against Ridling before the trial court, so we can evaluate the probative and prejudicial value of that evidence and

Ridling's proffered statements when considering the trial court's ruling in this case.

Kimberly was the only witness to testify at trial. Kimberly testified that she first met Ridling at Baring Cross Park in North Little Rock, as she was watching her brother and some friends playing basketball. Ridling approached Kimberly and her friend and asked if they would like to come to his house to see some paintings and drawings; the girls declined to go. A few weeks later, Kimberly was roller skating to the store to buy candy when Ridling again approached her and asked if she wanted to see some of his new paintings; this time, because she was by herself, Kimberly agreed. When they arrived at his home, they sat on his bed, and he showed her some paintings; he then told her she was pretty and started touching her face and kissing her. They then had sex that day. Kimberly did not tell anyone what had happened. She testified that she was eleven and in sixth grade at the time. Kimberly next saw Ridling about a year later, in the summer of 1996. She saw him on the street a few times, and he did not say anything to her, but a few weeks later, he spoke and asked if she wanted to see some new paintings and a t-shirt he had designed. She went to his house, but "nothing happened that time." Ridling asked her to come back, and the next time she went back to his house, they had sex. She continued going to his house for about a year or a year and a half. Kimberly stated that she was fourteen when she stopped seeing Ridling, and that he had given her a gift for her fourteenth birthday. She found out that she was pregnant during the summer between the eighth and ninth grade, and she gave birth in March of 1997.

Kimberly stated that she did not tell anyone about her relationship with Ridling for a long time, and when she did finally speak to the police, she told them that she was fourteen when she started her relationship with Ridling because she was scared and ashamed. During her first interview with the prosecutor, John Hout, she also told Hout that she was fourteen. The next time she saw Hout, she spoke with him alone, and she told him that she was eleven when she first had sex with Ridling. She also testified in a chancery court proceeding that she was eleven when the relationship began.

On cross-examination, Kimberly conceded that she had initially lied to the police, to her mother, and to the prosecutor, but said that, at the time, she was still talking with Ridling and that they had plans to get married and move to Memphis; she was protecting him, she claimed. She claimed that the only people she ever told about being under fourteen were the prosecutor and her parents. She acknowledged that she did not tell anyone that she was under fourteen until John Hout came to her and started pushing her for more information. She also noted that she knew before she came into court the day of trial that the issue of how old she was at the time was going to be an issue; she admitted that she said she was fourteen initially and had changed her story, but asserted that she had been protecting Ridling at first.

When questioned about when she became pregnant, Kimberly agreed that she told her doctor that her last menstrual period had started on June 21, 1996, which was two days before her fourteenth birthday. She stated that she had the baby when she was fourteen, in March of 1997, and that the child was not conceived when she was fourteen.

On redirect, Kimberly asserted again that she was eleven when she began her relationship with Ridling, and that the day the baby was conceived was not the first time she had had sex with him. She acknowledged that she had lied at first, but said it was because she was young, ashamed, and scared to say that she had been with a fifty-year-old man. She claimed she and Ridling had discussed what they would do "if anything ever came up to where . . . I got pregnant or anything, to say I was fourteen so he wouldn't get in trouble [and] I wouldn't get in trouble." At the end of her testimony, she agreed that she had lied to her mother, to the police, and to the prosecutor, but said that she was telling the truth that day because she was under oath. Kimberly concluded, "I can lie any time I get ready to."

■ Again, with regard to the statements 4 through 8, those statements do not pertain to Kimberly's prior sexual conduct under the rape-shield statute, and were irrelevant to the issue of whether Ridling had sexual intercourse with Kimberly before her fourteenth birthday, which was the only issue for the jury to

decide. The trial judge allowed Ridling to elicit testimony from Kimberly showing that she admitted lying any time she got ready, and that she specifically lied to her mother, the police, and the prosecutor. As already discussed, the Confrontation Clause guarantees an opportunity for effective cross-examination, and here the trial court permitted Ridling to vigorously cross-examine Kimberly to show she was a liar. However, in balancing the evidence under Ark. R. Evid. 403, the trial court did not allow Ridling to confuse the jury by going into matters that were collateral to the issue of Kimberly's age at the time Ridling began having sex with her. *See Evans v. State*, 317 Ark. 532, 878 S.W.2d 750 (1994) (when consent is not an issue, the trial court did not abuse its discretion by disallowing evidence of matters that were "entirely collateral" to the issue of sexual relations between this victim and the accused under Ark. R. Evid. 403).

Ridling further argues that the trial court should have permitted him to question Kimberly about her allegations of sex involving Michael Lofton, Jr. When she went to the hospital to give birth, Kimberly named Lofton, Jr., as the father of her baby. However, she later admitted that she had never had sex with Lofton, Jr., but instead had engaged in sexual intercourse with Michael Lofton, Sr. Ridling cites *West*, 290 Ark. 329, 719 S.W.2d 684, in support of his argument that evidence of similar allegations that are later admitted or proven to be false are not "sexual contact" as defined by the rape-shield statute, and such evidence is therefore not excluded under the statute.

After this court's decision in *West*, however, the General Assembly amended the rape-shield statute so that it prevented admission of "evidence of a victim's prior allegations of sexual conduct with the defendant or any other person which allegations the victim asserts to be true, or evidence offered by the defendant concerning prior allegations of sexual conduct by the victim with the defendant or any other person if the victim denies making the allegations[.]" Ark. Code Ann. § 16-42-101(b) (as amended by Act 943 of 1993). In *Booker v. State*, 334 Ark. 434, 976 S.W.2d 918 (1998), this court noted that the General Assembly had expressed its intent to broaden the rape-shield law to exclude both of these kinds of evidence. The *Booker* court further pointed out

that, at a pretrial hearing, no evidence was presented to show that the victim's prior allegation of rape was true, nor was there evidence provided that she denied having made the prior allegation. Consequently, the rape-shield statute as amended did not apply to defendant Booker's situation. *Booker*, 334 Ark. at 438. Thus, this court held that the trial court did not abuse its discretion in its Ark. R. Evid. 403 analysis or in its ruling that, if Booker's proffer was admitted, it would be unfairly prejudicial and misleading. *Id*.

■ The same is true in the present case. At the *in camera* hearing, Ridling offered only the piece of paper in which he listed Kimberly's statements to prove that she told the hospital that Michael Lofton, Jr. was the father of her baby; no other evidence was introduced at trial to prove or disprove this statement. In fact, the only exhibit in the record dealing with the baby's paternity was the joint stipulation that Ridling was the father. In addition to the fact that there was no proof as to whether or not Kimberly actually made this claim, there was also no proof or proffer of whether or not Kimberly would have confirmed or denied the allegations. Thus, as in *Booker*, the proposed evidence did not fall under the rape-shield statute; the trial court properly engaged in a 403 balancing test, and concluded that the statement would have been more prejudicial than probative of anything, especially since the paternity of the baby was not at issue. This ruling was not an abuse of the trial court's discretion.

In a sub-point, Ridling argues that the trial court should have permitted him to introduce Kimberly's testimony in the carnal abuse case against Michael Lofton, Sr., and he asserts that he was denied the opportunity to cross-examine her on this issue. Such cross-examination, Ridling claims, could have permitted him to challenge Kimberly's credibility and point out that she may have been mistaken about the time frame in which she was having sex with Ridling. "Essentially, she would have had to have agreed that she was having sex with both grown men in the same time frame," he asserts.

Ridling cites *Hubbard v. State*, 271 Ark. 937, 611 S.W.2d 526 (1981), for the proposition that evidence of sexual contact between the victim and a third party can be admissible where it

occurs in close proximity of time and location, in that it bears on material elements of the offense; he claims that evidence of Kimberly's relationship with Lofton, Sr., "bears on the issue of whether it was Lofton, Sr. or [Ridling] that had sexual contact with the victim before she turned fourteen years old."

It is difficult to understand what relevance Kimberly's other sexual encounters have to do with whether *Ridling* was having sex with her before her fourteenth birthday. Unfortunately, the fact that she was having sex with one older man does not prevent her from having sex with a second older man at the same time. Evidence that she was having sex with Lofton, Sr., therefore, could not have been relevant to the jury's determination of whether or not she was having sex with Ridling before reaching the age of fourteen. The judge ruled that such evidence could be admissible if Kimberly claimed she was a virgin when she began her relationship with Ridling, but the State never pursued this theory, and such evidence was never presented. Because Kimberly's relationship with Lofton, Sr. was irrelevant to the question of Kimberly's age when she began having sexual intercourse with Ridling, the trial court did not abuse its discretion in excluding it.

Finally, Ridling argues that he should have been permitted to introduce the above evidence during sentencing. The trial court denied his request to question Kimberly about her statements on the grounds that the rape-shield statute also applies during sentencing. Ridling asserts in his brief that he should have been allowed to introduce his proffered testimony "to show lack of any substantial harm to [Kimberly]. She may have been [age twelve to fourteen] when this was going on with Ridling, but she was sexually active with others of her own choosing and holding herself out to everyone to be an adult, and Lofton, Sr., was also convicted of having sex with her. A jury could easily have found that [Ridling] should have been sentenced to something less than the thirty-five years and that is his substantial prejudice." He concludes that the trial judge's failure to make a separate determination of the admissibility of this evidence at sentencing amounted to a failure to exercise discretion.

Ark. Code Ann. § 16-97-103 (Supp. 2001), dealing with evidence admissible during sentencing, provides as follows:

> Evidence relevant to sentencing by either the court or a jury may include, but is not limited to, the following, *provided no evidence shall be construed under this section as overriding the rape-shield statute, § 16-42-101*[.]

Thus, it is clear that the rape-shield law applies to sentencing as well as to the guilt phase, and because the trial court had already conducted an *in camera* hearing on the admissibility of the evidence, there was no need to conduct a second, identical hearing. The trial court did not fail to exercise its discretion, and further did not err in refusing to permit Ridling to introduce this evidence at the sentencing phase of his trial.

In his second major point for reversal, Ridling contends that the trial court erred in proceeding without Ridling's presence at the rape-shield hearing. He cites the case of *Bell v. State*, 296 Ark. 458, 757 S.W.2d 937 (1988), which quoted from *Kentucky v. Stincer*, 479 U.S. 1303 (1986), the rule that a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to the outcome if his presence would contribute to the fairness of the procedure. Ridling argues that, while he absented himself from the rape-shield hearing by failing to attend after receiving notice, it was error to proceed without him because it was a "critical stage" in the proceeding against him.

When a significant step in the case is taken in an accused's absence, the case must be reversed, if it appears that he has lost an advantage or has been prejudiced by reason of a step taken in his absence. *Bell*, 296 Ark. at 465. The reason for the rule is to secure to the accused a full and adequate defense at his trial. Where there is no possibility of prejudice, however, there is no reason for requiring the presence of the defendant. *Id*. at 465-66. The *Bell* court applied this harmless-error rule when the defendant "had an absolute right to demand to be present at the hearings on his [pretrial] motions, but did not do so." *Id*. at 467. This court has also held that a defendant had waived his presence *at trial* when he admitted that he overslept. *See Reece v. State*, 325 Ark. 465, 928 S.W.2d 334 (1996).

Before leaving this point, we merely note that the Federal Rules of Criminal Procedure provide that, although a defendant "shall be present" at every stage of the trial, he may waive his absolute right to be present if he voluntarily absents himself. Fed. R. Crim. P. 43. The Supreme Court, in *Taylor v. United States*, 414 U.S. 17 (1973), pointed out that this rule "reflects the long-standing rule recognized by this Court in *Diaz v. United States*, 223 U.S. 442 (1912)," which states as follows:

> [W]here the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present and leaves the court free to proceed with the trial in like manner and with like effect as if he were present.

The *Taylor* Court further stated that a defendant has "no right to interrupt the trial by his voluntary absence. . . . The right at issue is the right to be present, and the question becomes whether that right was effectively waived by his voluntary absence." *Id.* at 20. The Court concluded that the right was waived, pointing out the "governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward." *Id.* (quoting *Illinois v. Allen*, 397 U.S. 337 (1970) (Brennan, J., concurring)).

Thus, if a defendant may waive his right to be present *at the trial itself*, then surely he can be said to have waived his right to be present at a pretrial hearing, especially in the instant case, when Ridling acknowledged to his attorney that Ridling knew he was supposed to be there and signed a notice that he would be present. Further supporting this conclusion is the fact that there were no witnesses called, and his attorney did not protest that Ridling had any testimony to offer; Ridling's Sixth Amendment right to confront his accuser and his right to be heard were thus not violated. Ridling's counsel, in fact, even offered to formally waive Ridling's presence, and it was counsel who plunged ahead with the merits of the hearing even before the trial judge ruled on whether or not Ridling had to be there. Ridling knew he was supposed to be present at the hearing, and he voluntarily chose

not to be there. It seems clear that Ridling was not prejudiced by his decision to be absent from the hearing, and he should not be heard to complain on appeal that his own choice not to show up should result in the reversal of his conviction. *See, e.g., Lee v. State*, 343 Ark. 702, 38 S.W.3d 334 (2001).

In his final point, Ridling argues that the trial court erred in sustaining the prosecutor's objection to a portion of defense counsel's closing argument, as follows:

> DEFENSE COUNSEL: I'm just telling you she hasn't proven it. She's lying. I tell you what. I'm wondering what she's going to do when she has to tell her son ten years from now when he gets older that he put her [*sic*] daddy in prison cause she was lying.
>
> PROSECUTOR: Objection, your Honor. . . . This is the second time Mr. James has mentioned prison in his closing argument, your Honor, and the jury is. . .
>
> THE COURT: Mentioned what?
>
> PROSECUTOR: Prison in his closing argument. And they are not to consider punishment at this stage.
>
> THE COURT: Sustained.

Citing *Lee v. State*, 297 Ark. 421, 762 S.W.2d 790 (1989), Ridling submits that an objection not made until the second reference is not timely, and, therefore, waived by the State. Ridling says that he was entitled to get prison before the jury in the guilt-innocence phase, which he did, and it was too late to object. He further posits that defense counsel was free to argue his case as he saw fit, and this was denied him.

Even if the trial court erred in sustaining the State's belated objection, it was Ridling's burden, as appellant, to produce a record sufficient to demonstrate prejudicial error. *See Coulter v. State*, 343 Ark. 22, 31 S.W.2d 826 (2000). He simply fails to do so.

We first note that the transcript does not contain the remainder of Ridling's closing argument, so it is not possible to determine whether the trial court admonished the jury to disregard anything that defense counsel said, and from argument

made by Ridling and the State, defense counsel referenced the prison remarks twice before any objection was made. In addition, without the remaining portion of Ridling's closing argument, we cannot determine whether defense counsel was able to otherwise continue as he saw fit. He certainly fails in this appeal to point to the record and demonstrate how he was prejudiced, and this court will not reverse in the absence of prejudice. *See Ramaker v. State*, 345 Ark. 225, 46b S.W.3d 519 (2001); *Bledsoe v. State*, 344 Ark. 86, 39 S.W.2d 760 (2001). In sum, we hold that Ridling fails to show the trial court committed reversible error.

For the reasons above, we affirm.